## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 2017-24 |
| v. | ) | |
| | ) | |
| STEVEN BAXTER, SHALICA BAXTER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ATTORNEYS:

**Gretchen Shappert, United States Attorney**
**Everard E. Potter, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
    *For the United States of America,*

**Michael L. Sheesley**
St. Thomas, U.S.V.I.
    *For Steven Baxter.*


### ORDER

**GÓMEZ, J.**

Before the Court is the motion of Steven Baxter to suppress physical evidence.

### I.    FACTUAL AND PROCEDURAL HISTORY

On March 31, 2017, Customs and Border Protection ("CBP") officers were inspecting incoming mail at the Cyril E. King Airport on St. Thomas. Bo--a K9 certified to alert to the odor of marijuana, cocaine, heroin, methamphetamine, ecstasy, and concealed humans--was smelling packages on an arriving flight at

the airport. Bo's handler, Joseph Lopez ("Lopez"), was present.

Bo alerted to a package sent by Priority Mail.[1] The package was

sent from Jason Price in South Carolina to Mekelya Meade in St.

Thomas. CBP officer Richard Kouns ("Kouns")--without consent of

the sender or recipient, or the benefit of a court order--opened

the package and discovered a sweater that smelled of marijuana.

As Kouns was about to put the sweater back into the package, a

magazine and a round of ammunition fell out of the sweater.

Kouns then fully opened the sweater and discovered the parts for

a weapon. *See Suppression Hr'g Tr.*, ECF No. 99 at 25 (June 4,

2018). Lopez later explained that CBP officials regularly open

packages sent from the mainland United States to the United

States Virgin Islands without warrants because the CBP has

"border search authority" under those circumstances. *See id.* at

35:9.[2]

---

[1] Priority mail is one of several "classes of mail" that is maintained by the postal service "for the transmission of letters sealed against inspection." 39 U.S.C. § 404(c); *see also* Domestic Mail Manual § 113.2.2 ("Priority Mail matter is closed against postal inspection.").

[2] Lopez also shared his view that Bo is never wrong. Rather, human interpretation of what Bo indicates has been wrong.

> Q. Has Bo ever been wrong in the alert that he had provided?
> A. I don't think Bo is wrong. I think I may do a wrong interpretation.
> Q. What does that mean?
> A. With the alert that means that I can see that he changed his behavior, like something calls his attention that I can believe is an alert, and I do a wrong call, maybe, but I don't see that Bo has been wrong. He has been really reliable for the agency finding narcotics.

After hearing evidence, the Court asked the United States why no warrant was sought to search the packages:

> THE COURT: . . . So, why didn't the Government just get a warrant with respect to the item? It's in the Government's possession. They don't have to release it. . . . Why not get a warrant to just search it and avoid all of this?
> MS. VLASOVA: Your Honor, as law enforcement strategy and tactic, there is no warrant requirement.

*Id.* at 116:4-14.

On April 3, 2017, CBP officers discovered another package sent by Priority Mail from Jason Price in South Carolina to Mekelya Meade in St. Thomas. The April 3, 2017, package was similar in shape, size, and weight to the March 31, 2017, package. CBP officers x-rayed the package and concluded that it contained a firearm. Thereafter, the package was opened and examined. Inside the package, Kouns discovered a firearm, a magazine, and ammunition. Curiously, *after* opening the box, Kouns then had Bo sniff the package. *See id.* at 89:12-90:7

---

*Suppression Hr'g Tr.*, ECF No. 99 at 21:2-12. Alternatively, it seems that whenever Bo incorrectly alerts, Lopez is willing to take the blame by attributing the error to human interpretation.

> Q. And you've said before that Bo has not been wrong but you have been wrong before.
> A. Yes, Sir.
> Q. Okay. And so some alerts that Bo has given has led to nothing.
> A. Some alerts that I believe that Bo given [sic] alert to went to nothing.

*Id.* at 31:5-11. In either case, false positives which could trigger warrantless searches could result.

On June 7, 2017, the Grand Jury returned an Indictment charging Steven Baxter ("Baxter") with one count of illegally transporting two firearms in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D), and 924(a)(2). On March 8, 2018, the Grand Jury returned a Superseding Indictment charging Baxter with two counts of illegally transporting a firearm in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D), and 924(a)(2).

On March 26, 2018, Baxter moved to suppress the evidence uncovered by the search of the packages. The Court held an evidentiary hearing on Baxter's motion to suppress on June 4, 2018.

## II.  DISCUSSION

The Fourth Amendment protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. Const., amend. IV. The Fourth Amendment protects citizens from governmental intrusions into areas in which citizens have a "reasonable expectation of privacy." *See, e.g.*, *Byrd v. United States*, 138 S. Ct. 1518, 1526, 200 L. Ed. 2d 805 (2018). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

## A. Fourth Amendment Standing

The United States asserts that the packages in this matter were "sent from a Jason Price and addressed to Mekelya Meade." *See* ECF No. 155 at 2. The United States argues that--because the packages do not "bear[] his name" and because, "by his not guilty plea, [Baxter] denies an ownership interest" in the packages--Baxter has no legitimate expectation of privacy in the packages. *See id.*

"Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched." *Rakas v. Illinois*, 439 U.S. 128 (1978). "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted." *Id. at* 133-34 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134; *see also United States v. Davis* 393 Fed. App'x 895, 898 (3d Cir. 2010).

"Both senders and addressees of packages or other closed containers can reasonably expect that the government will not open them." *United States v. Villarreal*, 963 F.2d 770, 774 (5th

Cir. 1992). The Third Circuit has recognized that "individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." *United States v. Pettiway*, 429 Fed. App'x 132, 136 n.5 (3d Cir. 2011) (quoting *Villarreal*, 963 F.2d at 774).

Here, the United States acknowledges that Baxter is also known as Jason Price. *See Indictment*, ECF No. 70 at 1, 3, 5 (charging "STEVEN BAXTER a/k/a JASON PRICE" with illegally mailing firearms). The United States alleges that Baxter, using his alias Jason Price, mailed the packages at issue in this matter. Presumably, the packages are relevant because they are Baxter's. That is precisely why the United States seeks to use the packages against Baxter in the United States's case-in-chief. Under these circumstances, the Court holds that Baxter has standing to challenge the admissibility of the packages. As Baxter has standing to challenge the warrantless searches of the packages, the Court will next address the validity of the warrantless searches that occurred here.

**B. Warrantless Searches of Mail**

"Warrantless searches are presumptively unreasonable." *Horton v. California,* 496 U.S. 128, 133 (1990); *see also Katz v. United States,* 389 U.S. 347, 357 (1967) ("Searches conducted without warrants have been held unlawful 'notwithstanding facts

unquestionably showing probable cause.'" (quoting *Agnello v. United States,* 269 U.S. 20, 33 (1925)). Moreover, it is irrelevant whether a search impermissibly conducted without a warrant ultimately uncovers evidence of a crime. *See Jacobsen*, 466 U.S. at 113 ("Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.").

Article I, Section 8 of the U.S. Constitution grants Congress the power "[t]o establish Post Offices and post Roads." U.S. Const., Art. I, § 8, cl. 7. This grant of power "embraces the regulation of the entire postal system of the country," which "necessarily involves the right to determine what shall be excluded" from the mails. *Ex parte Jackson*, 96 U.S. 727, 728 (1877).

Since as early as 1877, in *Ex parte Jackson*, 96 U.S. 727 (1877), the United States Supreme Court has recognized that this power does not remove mail from the protection of the Fourth Amendment. *See id.* In determining the reach of the Fourth Amendment to mailed matter,

> a distinction is to be made between different kinds
> of mail matter,-between what is intended to be kept
> free from inspection, such as letters, and sealed
> packages subject to letter postage; and what is open
> to inspection, such as newspapers, magazines,
> pamphlets, and other printed matter, purposely left
> in a condition to be examined. Letters and sealed
> packages of this kind in the mail are as fully

> guarded from examination and inspection, except as
> to their outward form and weight, as if they were
> retained by the parties forwarding them in their own
> domiciles. The constitutional guaranty of the right
> of the people to be secure in their papers against
> unreasonable searches and seizures extends to their
> papers, thus closed against inspection, wherever
> they may be.

*Id.* at 733.

In light of that strong protection afforded to sealed mail

packages against searches, the Supreme Court made it clear that

such packages were accorded the same Constitutional protection

as items in a home. That is, only a warrant could justify the

search of a mail package.

> *Whilst in the mail, they can only be opened and
> examined under like warrant*, issued upon similar
> oath or affirmation, particularly describing the
> thing to be seized, *as is required when papers are
> subjected to search in one's own household*.

*Id.* (emphasis added).

Moreover, the *Jackson* Court clearly outlined the limits of

any other law that might purport to subjugate the Constitutional

protection afforded sealed packages against searches.

> *No law of Congress can place in the hands of
> officials connected with the postal service any
> authority to invade the secrecy of letters and such
> sealed packages in the mail; and all regulations
> adopted as to mail matter of this kind must be in
> subordination to the great principle embodied in the
> fourth amendment of the Constitution.*

*Id.* (emphasis added).

The Supreme Court reaffirmed these principles in *United States v. Van Leeuwen*, 397 U.S. 249 (1970) and again in *United States v. Jacobsen*, 466 U.S. 109 (1984). In *Van Leeuwen*, customs officials suspected that two packages contained gold coins that had been illegally imported from Canada. 397 U.S. at 249-50. The packages in question were mailed first-class. *Id.* at 250. Postal regulations in effect at the time "describe[d] 'first-class' mail as 'matter closed against postal inspection,' which follow[ed] the definition" in the relevant statute. *Id.* at 250 n.1. The packages were briefly detained while customs officials obtained a warrant to search them. *Id.* at 250, 252. Only when warrants were issued did customs officials inspect the contents of the packages. *Id.* at 250. On appeal, the Supreme Court held that the pre-search detention of the packages was permissible under the Fourth Amendment. *Id.* at 253.

The Supreme Court explained that "[i]t has long been held that first-class mail such as letters and sealed packages subject to letter postage—as distinguished from newspapers, magazines, pamphlets, and other printed matter—is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment." *Id.* at 251. Analogizing the seizure of mail to a *Terry* frisk, the Supreme Court explained that "[t]he only thing done [by the customs officials] on the basis of

suspicion was detention of the packages." *Id.* at 252. This did

not occasion any "invasion of the right 'to be secure' in the

'persons, houses, papers, and effects' protected by the Fourth

Amendment against 'unreasonable searches and seizures.'" *Id.*

(quoting U.S. Const., amend. IV). While in "theory" "detention

of mail could at some point become . . . unreasonable," the

detention in *Van Leeuwen* was reasonable under the Fourth

Amendment. *Id.* Significantly, law enforcement did not search the

sealed package until they obtained a search warrant.

In *Jacobsen*, a package was damaged and torn by a forklift.

The package was in the care of a private freight carrier. 466

U.S. at 111. Employees of the freight carrier opened the package

and discovered a white powdery substance. *Id.* The employees

notified federal law enforcement officials, who tested the

substance, which was revealed to be cocaine. *Id.* On appeal, the

Supreme Court held that the search did not violate the Fourth

Amendment. *Id.* at 126.

The Fourth Amendment protects individuals' right "to be

secure in their persons, houses, papers and effects, against

unreasonable searches and seizures." *See* U.S. Const., amend. IV.

> When the wrapped parcel involved in this case was
> delivered to the private freight carrier, it was
> unquestionably an "effect" within the meaning of the
> Fourth Amendment. Letters and other sealed packages
> are in the general class of effects in which the
> public at large has a legitimate expectation of

> privacy; warrantless searches of such effects are
> presumptively unreasonable. Even when government
> agents may lawfully seize such a package to prevent
> loss or destruction of suspected contraband, the
> Fourth Amendment requires that they obtain a warrant
> before examining the contents of such a package. Such
> a warrantless search could not be characterized as
> reasonable simply because, after the official
> invasion of privacy occurred, contraband is
> discovered.

*Jacobsen*, 466 U.S. at 114 (footnotes omitted).

Significantly, however, the Fourth Amendment only
"proscrib[es] government action; it is wholly inapplicable 'to a
search or seizure, even an unreasonable one, effected by a
private individual not acting as an agent of the Government or
with the participation or knowledge of any governmental
official.'" *Id.* at 114 (quoting *Walter v. United States,* 447
U.S. 649, 662 (1980) (Blackmun, J., dissenting)). In *Jacobsen*,
"[t]he initial invasions of respondents' package were occasioned
by private action," and therefore did not violate the Fourth
Amendment. *Id.* at 115. The permissibility of the government's
subsequent actions "must be tested by the degree to which [those
actions] exceeded the scope of the private search." *Id.* In that
case, the Supreme Court held that the government's actions did
not violate any expectation of privacy that had not already been
frustrated by the private freight carrier, and thus did not
violate the fourth amendment. *Id.* at 126.

As the cases cited above illustrate, not all packages require a warrant prior to being searched. As the Supreme Court in *Ex parte Jackson* instructed, "a distinction is to be made between different kinds of mail matter,—between what is intended to be kept free from inspection, such as . . . sealed packages, . . . ; and what is open to inspection, such as . . . printed matter, purposely left in a condition to be examined." *Ex parte Jackson*, 96 U.S. at 733.

To that end, Congress directed the Postal Service to "maintain one or more classes of mail for the transmission of letters sealed against inspection." 39 U.S.C. § 404(c) ("Section 404"). Congress has further made clear that any mail designated as "sealed against inspection" may only be opened "under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the authorization of the addressee." *Id.*

In accordance with Congress's mandate, the Postal Service regulations provide that "[s]ealed mail is mail that under postal laws and regulations is included within a class of mail maintained by the Postal Service for the transmission of letters sealed against inspection." 39 C.F.R. § 233.3(c)(3). "Unsealed mail is mail that under postal laws or regulations is not

included within a class of mail maintained by the Postal Service

for the transmission of letters sealed against inspection." 39

C.F.R. § 233.3(c)(4). "Sealed mail includes," among other

classes of mail, "Priority Mail." 39 C.F.R. § 233.3(c)(3).

Similarly, through 39 C.F.R. § 111.1, the Postal Service

incorporated into the regulations by reference "the Mailing

Standards of the United States Postal Service, Domestic Mail

Manual, a looseleaf document published and maintained by the

Postal Service." 39 C.F.R. § 111.1. The Domestic Mail Manual

provides that "Priority Mail matter is closed against postal

inspection." Domestic Mail Manual § 113.2.2.

Here, the packages were mailed from South Carolina to the

United States Virgin Islands via Priority Mail. Upon the arrival

of the packages in the Virgin Islands, CBP officers searched the

packages without a warrant. The government seems to have taken

this course because, among other things, the packages did not

bear some indication that they were first-class mail or a

letter.

> Q. . . . [A]re you able to determine if this was
> mailed as a first class mail?
> A. It was mailed as a priority mail.
> Q. What does that mean in terms of whether or not
> it is a first class mail?
> A. First class mail must always have a stamp on it
> that states "first class mail" unless there is some
> separate identify [sic] that clearly defines it as
> first class.

*Suppression Hr'g Tr.*, ECF No. 99 at 43:8-17. In the absence of a

stamp or some indication that the class of mail is first-class,

the government, since perhaps 2012, has subjected sealed

packages to warrantless searches.

> THE COURT: Officer Lopez, when you say "checking the
> mail," you mean having -- what do you mean by that?
> THE WITNESS: Checking the cargo, the boxes, the
> cargo, because we're not allowed to go to the letter.
> We cannot touch the letter mail. So we check all of
> the cargo coming into
> the Virgin Islands.
> Q. (By Mr. Sanchez:) Why can't you get to the letter,
> to the mail?
> A. Those are the rules that we were explained, we
> cannot touch the letter. Unless we get a search
> warrant, we can't touch that.

*Id.* at 33:13-25.

The government's position not only seems to be contrary to

well-established Constitutional law, *see, e.g.*, *Jacobsen*, 466

U.S. at 114 (recognizing "wrapped parcel" containing white

powdery substance as "unquestionably an 'effect' within the

meaning of the Fourth Amendment"), remarkably it is even

contrary to the regulations regarding sealed mail packages. See

Domestic Mail Manual § 113.2.2 (""Priority Mail matter is closed

against postal inspection."). Because Priority Mail is the

equivalent of a "wrapped parcel" sealed against inspection, law

enforcement officers were required to obtain a warrant before

opening the packages. Accordingly, their failure to obtain a

warrant was unconstitutional. Indeed, such a warrantless search

could only be constitutionally permissible if an exception to

the warrant requirement applied to the searches undertaken here.

**C. Exception to Warrant Requirement**

"Searches conducted outside the judicial process, without

prior approval by a judge or magistrate, are *per se* unreasonable

under the Fourth Amendment subject only to a few

specifically established exceptions." *Katz*, 389 U.S. at 357.

"Such exceptions are based on the Supreme Court's determination

that a particular search is reasonable, that is, that the

government's legitimate interests in the search outweigh the

individual's legitimate expectation of privacy in the object of

the search." *United States v. Salmon*, 944 F.2d 1106, 1120 (3d

Cir. 1991); *see also United States v. Hyde,* 37 F.3d 116, 118 (3d

Cir. 1994). Warrantless border searches are one such exception.

*California Bankers Ass'n v. Shultz,* 416 U.S. 21, 63 (1974)

("[T]hose entering and leaving the country may be examined as to

their belongings and effects, all without violating the Fourth

Amendment."); *see also Hyde,* 37 F.3d at 118.

In *United States v. Ramsey,* 431 U.S. 606 (1977), the United

States Supreme Court recognized that sealed envelopes

*originating* in another country and *entering* the United States

fell within the border exception. Indeed, in that case, the

Supreme Court counseled that

>    customs officials could search, without probable
>    cause and without a warrant, envelopes carried by an
>    entering traveler, whether in his luggage or on his
>    person . . . . Surely no different constitutional
>    standard should apply simply because the envelopes
>    were mailed, not carried. The critical fact is that
>    the envelopes cross the border and enter this
>    country, not that they are brought in by one mode of
>    transportation rather than another. It is their
>    entry into this country from without it that makes
>    a resulting search "reasonable."

*Id.* at 620; *cf. United States v. Hyde*, 37 F.3d 116 (3d Cir.

1994).[3]

To the extent the sealed packages crossed an international

border; that is, in either direction between non-United States

territory and United States territory, arguably the packages may

not be an "effect" protected by the Fourth Amendment. The Court

will next address border issues implicated by the searches here,

---

[3]    In *United States v. Hyde,* 37 F.3d 116 (3d Cir. 1994), the defendants
were subjected to warrantless searches in the St. Thomas airport as they were
leaving the Virgin Islands for Florida. *Id.* at 117. The Third Circuit held
"that routine customs search of persons and their belongings without probable
cause as they leave the Virgin Islands for the continental United States are
not unreasonable under the Fourth Amendment." *Id.* at 117.
    As for the individual's interest in privacy, the Third Circuit found
this was limited in the same manner as with the international border. *Id.*
"[B]order searches have been consistently conducted at the border between the
Virgin Islands and the mainland since the United States acquired the Virgin
Islands." *Id.* While there might not be universal knowledge of this fact, the
Third Circuit "believe[d] that there [wa]s sufficient public knowledge of the
distinctive status of the Virgin Islands to alert such travelers to the
possibility of border inquiries not experienced at state lines." *Id.*
    "Balancing the intrusion on the individual's Fourth Amendment interests
against the degree to which routine customs searches promote legitimate
governmental interests," the Third Circuit held that the searches in that
case were not unreasonable under the Fourth Amendment. *Id.*

as well as other circumstances that may allow for warrantless
searches.

### D. **Presence of Circumstances That May Permit Warrantless Searches**

Here, CBP officers subjected packages mailed from South
Carolina to the Virgin Islands to warrantless searches. South
Carolina assuredly is not a foreign country, such that sealed
mail from that state would ordinarily be subject to warrantless
search. Thus, the Priority Mail packages in this case that
originated in South Carolina are sealed domestic mail. *See*
Domestic Mail Manual § 113.2.2. Second, they remain protected
from a warrantless search unless their native inviolate
character is transformed by some intrusive search by a non-
government agent, *e.g.*, *Jacobsen* 466 U.S. at 115, or they are
transferred to a foreign territory, *see Ramsey,* 431 U.S. at 620.
If neither of these circumstances occurred, the Priority Mail
packages here should be free from warrantless searches. If
neither circumstance occurred and a search is permissible,
arguably the Fourth Amendment does not apply in the United
States Virgin Islands. Alternatively, it is arguable that some
hybrid form of the Fourth Amendment exists in the Virgin
Islands, the legal vestiges of which are a version that (1) is
devoid of the normal Fourth Amendment Constitutional protections
highlighted by the Supreme Court in *Ex parte Jackson*; and (2)

lacks any reliable and predictable vigor. The Court addresses
each potential transformative circumstance in turn.

### 1. Warrantless Searches by a Private Actor

The record indicates that the searches here were undertaken
solely by government officials. Thus, the searches do not fall
into the category of searches conducted by private actors
(independent of government direction), like that in *Jacobsen*,
that escape Fourth Amendment scrutiny.

### 2. Transfer of Package To or From a Non-United States Territory

The packages at issue here were mailed from the mainland to
the Virgin Islands. They never left United States territory.
Unless some other legally transformative event occurred, a
warrantless search of the Priority Mail packages here would be
unconstitutional. Indeed, if the sealed packages here were
destined for Puerto Rico, there is little dispute that the
packages would be protected from warrantless searches. *United
States v. Colon-Solis*, 508 F. Supp. 2d 186, 191 n.2 (D.P.R.
2007) (discussing "well-established principle that shipments to
and from Puerto Rico are not subject to inspection under the
border exception to the Fourth Amendment"). The United States
has indicated as much in its supplemental briefing on Baxter's
motion to suppress. *See* ECF No. 155 at 1 ("The Court's initial
inquiry posed two questions. The first question is whether

Customs and Border protection can search mail arriving in Puerto
Rico from the mainland United States without first obtaining a
warrant. The government's answer is no."); *see also Krystal
Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337
F.3d 314, 319 (3d Cir. 2003) ("[A] plaintiff, who has obtained
relief from an adversary by asserting and offering proof to
support one position, may not be heard later in the same court
to contradict himself in an effort to establish against the same
adversary a second claim inconsistent with his earlier
contention." (internal quotation marks omitted)). That position
is not surprising, as Puerto Rico is a territory of the United
States. A person or thing traveling from the mainland United
States to Puerto Rico leaves United States territory and arrives
in United States territory. Given that circumstance, it would
seem that, constitutionally, a warrantless search of the
packages here may be permissible if, unlike a package arriving
in Puerto Rico, arrival in the Virgin Islands was the legal
equivalent of arrival in a non-United States territory.

This Court recently addressed the domestic nature of the
United States Virgin Islands in the context of a tariff law. In
*United States v. Ten Thousand Six Hundred & Seventy-Seven
Dollars ($10,677.00) in U.S. Currency, Representing 5,419 Puerto
Rican Lottery Tickets*, No. CV 2016-12, 2018 WL 2745903, at *4

(D.V.I. June 7, 2018) (the "Puerto Rican Lottery Case"), this

Court was confronted with the question of whether the United

States Virgin Islands was a "foreign country" under 19 U.S.C. §

1305(a) ("Section 1305"), which provides that "[a]ll persons are

prohibited from importing into the United States from any

foreign country . . . any lottery ticket." *See* 19 U.S.C. §

1305(a).

In the Puerto Rican Lottery case, the Court reasoned:

> Section 1305(a) forbids an individual from
> "importing [certain goods] into the United States
> *from any foreign country*." 19 U.S.C. § 1305(a)
> (emphasis added). The text references two geographic
> categories: the United States and foreign countries.
> It does not necessarily follow that there are *only*
> two dichotomous geographic categories for customs
> purposes: the United States customs territory (which
> excludes the Virgin Islands) and foreign countries
> (of which the Virgin Islands would be regarded as
> part). If that were the case, then the phrase "from
> any foreign country," would be entirely superfluous
> as any good "import[ed] ... *into* the United States"
> would necessarily be imported from a foreign
> country. *See id.* (emphasis added).

*Id.* at *4. In addition to the plain language of the statute, the

Court also found that "[r]elevant caselaw pre-dating the passage

of 19 U.S.C. § 1305(a) also supports the conclusion that the

Virgin Islands is not a foreign country." *Id.* at *6. The Court

explained:

> The Supreme Court first addressed whether a United
> States territory constituted a foreign country under
> the tariff laws in *De Lima v. Bidwell.* 182 U.S. 1,
> 21 S. Ct. 743, 45 L.Ed. 1041 (1901). In that case,

the Supreme Court considered whether a tariff
statute that provided that certain duties "shall be
levied, collected, and paid upon all articles
imported from foreign countries" applied to articles
imported from Puerto Rico. *Id.* at 180-181. The
Supreme Court held that the statute did not apply.
It reasoned, in pertinent part, that:

> Territory thus acquired can remain a
> foreign country under the tariff laws only
> upon one or two theories: Either that the word
> 'foreign' applies to such countries as were
> foreign at the time the statute was enacted,
> notwithstanding any subsequent change in their
> condition, or that they remain foreign under
> the tariff laws until Congress has formally
> embraced them within the customs union of the
> states. The first theory is obviously
> untenable ... *[A] country ceases to be foreign
> the instant it becomes domestic.* So, too, if
> Congress saw fit to cede one of its newly
> acquired territories (even assuming that it
> had the right to do so) to a foreign power,
> there could be no doubt that from the day of
> such cession and the delivery of possession
> such territory would become a foreign country,
> and be reinstated as such under the tariff
> law. Certainly no act of Congress would be
> necessary in such case to declare that the
> laws of the United States had ceased to apply
> to it.
>
> *The theory that a country remains foreign
> with respect to the tariff laws until Congress
> has acted by embracing it within the customs
> union presupposes that a country may be
> domestic for one purpose and foreign for
> another.* It may undoubtedly become necessary,
> for the adequate administration of a domestic
> territory, to pass a special act providing the
> proper machinery and officers, as the
> President would have no authority, except
> under the war power, to administer it himself;
> but no act is necessary to make it domestic
> territory if once it has been ceded to the
> United States. We express no opinion as to
> whether Congress is bound to appropriate the
> money to pay for it. This has been much

> discussed by writers upon constitutional law,
> but it is not necessary to consider it in this
> case, as Congress made prompt appropriation of
> the money stipulated in the treaty. *This
> theory also presupposes that territory may be
> held indefinitely by the United States*; that
> it may be treated in every particular, except
> for tariff purposes, as domestic territory;
> that laws may be enacted and enforced by
> officers of the United States sent there for
> that purpose; that insurrections may be
> suppressed, wars carried on, revenues
> collected, taxes imposed; in short, that
> everything may be done which a government can
> do within its own boundaries, and yet that the
> territory may still remain a foreign country.
> That this state of things may continue for
> years, for a century even, but that until
> Congress enacts otherwise, it still remains a
> foreign country. To hold that this can be done
> as matter of law we deem to be pure judicial
> legislation. *We find no warrant for it in the
> Constitution or in the powers conferred upon
> this court.* It is true the nonaction of
> Congress may occasion a temporary
> inconvenience; but it does not follow that
> courts of justice are authorized to remedy it
> by inverting the ordinary meaning of words.
>
> *Id.* at 197–98 (emphasis added). The Supreme Court
> subsequently reaffirmed, several times, that a
> United States territory is not a foreign country.
> *See, e.g., The Diamond Rings*, 183 U.S. 176, 22 S.
> Ct. 59, 46 L.Ed. 138 (1901) (reaching the same
> conclusion with respect to the Philippine Islands);
> *Faber v. United States*, 221 U.S. 649, 658, 31 S. Ct.
> 659, 659, 55 L.Ed. 897 (1911)(holding that a most
> favored nation clause in a treaty with Cuba did not
> require the United States to extend to Cuba a
> preferential duty rate that had been granted to the
> Philippine Islands).

*Id.*

    While not directly on point, the reasoning in the Puerto

Rican Lottery Case provides some guidance here on the question

of whether the United States Virgin Islands is non-United States

territory for Fourth Amendment purposes, such that it should be

treated differently than Puerto Rico with respect to warrantless

searches of sealed packages travelling from the United States

mainland to a well-established United States territory.[4] The

Court is aware of no precedent that would require treating the

United States Virgin Islands as a foreign country or non-United

States territory for the purposes of the Fourth Amendment.

### 3. Application of the Fourth Amendment in the Virgin Islands

While the Virgin Islands is "[o]bviously . . . not a

'foreign country,'" it is not a state. *Vento v. Dir. of Virgin*

*Islands Bureau of Internal Revenue*, 715 F.3d 455, 466 (3d Cir.

2013). Rather, the Virgin Islands is "an unincorporated

territory of the United States." *Ballentine v. United States*,

486 F.3d 806, 811 (3d Cir. 2007). The Third Circuit has opined

that "[a]n unincorporated territory is one that is not nearing

---

[4] The Virgin Islands, like Puerto Rico, has been part of the United States for more than a century. They each have local government, with local courts, legislatures, and executives. See, e.g., *Rodriquez v. 32nd Legislature of Virgin Islands*, 859 F.3d 199, 206 (3d Cir. 2017) (explaining that "the [Revised Organic Act of 1954] divides the Virgin Islands government into legislative, executive, and judicial branches and thereby 'implicitly incorporate[s] the principle of separation of powers into the law of the territory' (quoting *Kendall v. Russell*, 572 F.3d 126, 135 (3d Cir. 2009)); *Buscaglia v. Dist. Court of San Juan*, 145 F.2d 274, 283 (1st Cir. 1944) ("We concede that the doctrine of separation of powers is implicit in the Organic Act of Puerto Rico[, which divides the government of Puerto Rico into legislative, executive, and judicial branches].").

statehood and whose subjects do not enjoy full constitutional

guarantees. For example, Virgin Islands residents are not

permitted to vote in presidential elections, although they are

U.S. citizens. They are represented in Congress by a single non-

voting delegate." *Vooys*, 901 F.3d at 177 n.10 (citations

omitted). The Fourth Amendment, however, is not among the

constitutional guarantees denied to Virgin Islanders. *See* 48

U.S.C. § 1561 (providing that "the first to ninth amendments

inclusive" "shall have the same force and effect there as in the

United States or in any State of the United States").

Indeed, it is well-settled that "[t]he Fourth Amendment

applies in the United States Virgin Islands." *United States v.

Mathurin*, 561 F.3d 170, 174 n.3 (3d Cir. 2009); *see also

Boumediene v. Bush*, 553 U.S. 723, 758 (2008) (explaining that,

"as early as . . . 1922, the [U.S. Supreme] Court took for

granted that even in unincorporated Territories the Government

of the United States was bound to provide to noncitizen

inhabitants 'guaranties of certain fundamental personal rights

declared in the Constitution.'" (quoting *Balzac v. Porto Rico,*

258 U.S. 298, 312 (1922)); *Soto v. United States*, 273 F. 628,

633 (3d Cir. 1921) (explaining that after the United States

acquired the United States Virgin Islands, "the fundamental law

of the Constitution guaranteeing certain rights to all within

its protection," namely the law securing "natural or personal

rights" that are "enforced . . . by prohibition against

interference," applied of its own force).

### 4. Customs Zone Exclusion as a Basis for Hybrid Application of Fourth Amendment to United States Territory

The Court will next consider whether, in spite of the

United States Virgin Islands's status as a United States

Territory, there is nevertheless some type of border that would

justify warrantless searches on persons and things traveling

from the mainland United States to the United States Virgin

Islands.

To appreciate the underpinnings that should inform any

border or customs zone discussion involving the Virgin Islands,

a brief review of some Virgin Islands history is warranted.

On April 1, 1914, Christian the Tenth, King of Denmark, the

Vandals and the Goths, Duke of Slesvig, Holstein, Stormarn,

Ditmarsh, Lauenborg, and Oldenborg, sanctioned Danish Law No.

64-1914. Section 1 of that law, in pertinent part, provides:

> On all goods which are imported in St. Thomas and
> St. Jan, and which do not, according to § 2 below,
> enter duty free, an import duty of 6% of the value
> shall be imposed . . . .

Act No. 64-1914, concerning Custom House and Ships Dues in St.

Thomas and St. Jan, § 1 (Apr. 1, 1914), *reprinted in* 1 V.I.C.,

Historical Documents, Organic Act of 1936. In accord with Danish

Law No. 64-1914, an ordinance of the Colonial Council of St.

Thomas and St. Jan, approved on August 6, 1914, provided

guidance for the imposition and collection of import duties.

Colonial Council of St. Thomas and St. Jan Ordinance of August

6, 1914 (Aug. 6, 1914), *reprinted in* 1 V.I.C., Historical

Documents, Organic Act of 1936. Section 29 of the Ordinance

provided, in pertinent part, that

> [a]ll amounts derived from confiscations and fines,
> arising from this Ordinance, shall accrue to the
> Colonial Treasury . . . .

*Id.* at § 29.

"When the United States purchased the Virgin Islands from

Denmark in 1917, laws were already in place which provided for

Customs duties to be levied upon goods coming into the Virgin

Islands, with the revenue going to the colonial treasury."

*Paradise Motors, Inc. v. Murphy*, 892 F. Supp. 703, 704 (D.V.I.

1994) (quoting *United States v. Chabot,* 19 V.I. 28, 37, 531 F.

Supp. 1063, 1069 (D.V.I. 1982)). After purchasing the Virgin

Islands, Congress passed the Organic Act of 1917 (the "1917

Organic Act"). Section 4 of that act, codified at 48 U.S.C. §

1395, provides in relevant part that "the customs laws and

regulations" in the Virgin Islands in effect before the purchase

would "continue in force and effect."[5] Pub. L. No. 64-389, § 4,

39 Stat. 1132 (1917). In 1932, Congress amended the 1917 Organic

Act to provide: "The officials of the Customs and Postal

Services of the United Sates are hereby directed to assist the

appropriate officials of the municipality of Saint Croix, or of

the municipality of Saint Thomas and Saint John, in the

collection of these taxes." Pub. L. No. 72-193, § 4, 47 Stat.

333 (1932).

In 1936, Congress passed the Organic Act of 1936 (the "1936

Organic Act"). Section 36 of that act, codified at 48 U.S.C. §

1406i, provides in relevant part that, "[u]ntil Congress shall

otherwise provide, all laws concerning import duties and customs

in the municipality of Saint Thomas and Saint John now in effect

shall be in force and effect in and for the Virgin Islands."

---

[5] The Danish customs laws extended by the Act of 1917 referred primarily
to the import duty established and enforced pursuant to two
Danish laws, both enacted in 1914. The first law imposed a 6%
"import duty" on all goods imported into St. Thomas and St.
John. Danish Law No. 64 of April 1, 1914, concerning Custom
House and Ships Dues in St. Thomas and St. Jan ("Danish Law
No. 64"), *reprinted in* V.I. Code Ann., Historical Documents,
69-74 (1967). The second law, Ordinance of August 6, 1914,
promulgated rules for the collection of the import duty
established by Danish Law No. 64. Ordinance of August 6, 1914,
*reprinted in* V.I. Code Ann., Historical Documents, 74-81 (1967)
("Ordinance of 1914").

As originally enacted, these laws did not apply to the
island of St. Croix; however in 1936 Congress made these Danish
customs laws applicable throughout the Virgin Islands. 48
U.S.C. § 1406i (1976).

*Paradise Motors, Inc.*, 892 F. Supp. at 705.

Pub. L. No. 74-749, § 36, 49 Stat. 1816 (1936). Section 36 also
directed the Secretary of the Treasury to "designate the several
ports and sub-ports of entry in the Virgin Islands of the United
States and shall make such rules and regulations and appoint
such officers and employees as he may deem necessary for the
administration of the [local] customs laws in the Virgin Islands
of the United States." *Id.*

In 1954, Congress passed the Revised Organic Act. The
Revised Organic Act did not speak to the Danish custom laws
addressed in Section 36 of the 1936 Organic Act and Section 4 of
the 1917 Organic Act. Section 8 of the Revised Organic Act,
codified at 48 U.S.C. 1574, provided, however, that the "laws
made applicable to the Virgin Islands by or pursuant to the
[1936 Revised Organic] Act . . . and all local laws and
ordinances in force in the Virgin Islands . . . on the date of
approval of this Act shall, to the extent they are not
inconsistent with this Act, continue in force and effect." Pub.
L. No. 83-517, § 7(c), 68 Stat 501 (1954). As such, Section 36
of the 1936 Organic Act remains in effect. *See, e.g.*, *Polychrome
Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 n. 29 (3d Cir. 1993).
Under Section 28 of the Revised Organic Act, the "proceeds of
customs duties, . . . less the cost of collecting such duties,"

were to "be covered into the treasury of the Virgin Islands."[6]

Pub. L. No. 83-517, § 28(a), 68 Stat 501 (1954).

In 1977, Congress amended Section 8 of the Revised Organic Act and added a subsection (f). *See* Pub. L. No. 95-134 (HR 6550), § 301(c), 91 Stat 1159 (1977). Subsection (f) provides:

> (f) Customs duty; duty-free importation; effect on other customs laws
>> (1) The Legislature of the Virgin Islands may impose on the importation of any article into the Virgin Islands for consumption therein a customs duty. The rate of any customs duty imposed on any article under this subsection may not exceed--
>>> (A) if an ad valorem rate, 6 per centum ad valorem; or
>>> (B) if a specific rate or a combination ad valorem and specific rate, the equivalent or 6 per centum ad valorem.
>> (2) Nothing in this subsection shall prohibit the Legislature of the Virgin Islands from permitting the duty-free importation of any article.
>> (3) Nothing in this subsection shall be construed as empowering the Legislature of the Virgin Islands to repeal or amend any provision in law in effect on the day before October 15, 1977, which pertains to the customs valuation or customs classification of articles imported into the Virgin Islands.

*Id.; see also* 48 U.S.C. § 1574(f).

Under this authority, the Government of the Virgin Islands enacted 33 V.I.C. § 525 ("Section 525"). Section 525 provides:

---

[6] In 1980, Congress passed 48 U.S.C. § 1642a, which similarly provides that "the proceeds of customs duties collected in the Virgin Islands less the cost of collecting all said duties shall . . . be covered into the Treasury of the Virgin Islands." 48 U.S.C. § 1642a; see also Pub. L. No. 96-304, Title I, § 100, 94 Stat. 907 (1980).

The amount of customs duty to be paid on any article
of foreign origin imported into the Virgin Islands
which article has been shipped from within the United
States Customs Zone shall be that amount which when
added to the duty paid to the United States on said
article equals six percent of the value of the
article when imported into the Virgin Islands. For
the purpose of the preceding sentence, the amount of
the duty paid in the United States shall be construed
to be the greater of the following:
>    (1) The amount of duty actually paid on said
>    articles to the United States as shown on a
>    receipt from the U.S. Customs Service or by other
>    documentation acceptable to the U.S. Customs
>    Service officials in the Virgin Islands.
>    (2) The amount of duty that would be payable on
>    said article to the United States based on the
>    rates of duty on such articles shown in the tariff
>    schedules of the United States, as amended (12
>    U.S.C. § 1202), and the value of such article
>    when imported into the United States.

In the case of (2) above, documentation acceptable
to the U.S. Customs Service officials in the Virgin
Islands showing that the item has been shipped from
within the United States Customs Zone shall be
required of the importer. Should the amount of duty
paid to the United States on an article as computed
under (1) or (2) above be six percent or greater of
the value of the article when imported into the
Virgin Islands, then such article shall enter the
Virgin Islands free of duty.

For the purposes of this section, an article is not
shipped from within the United States Customs Zone
if it is shipped from a duty-free warehouse located
in the United States, if it is transshipped through
the United States without incurring a customs duty
in the United States, or if it is shipped in any
other manner which avoids the payment of a customs
duty in the United States.

33 V.I.C. § 525. In addition, while the Virgin Islands repealed

all Danish laws when it adopted the Virgin Islands Code, it

exempted "the 'Law concerning Custom House and Ship Dues in St.

Thomas and St. Jan'" from that repeal. *See* 1 V.I.C. § 6.

As discussed above, Section 36 of the 1936 Organic Act

directed the Secretary of the Treasury to "make such rules and

regulations and appoint such officers and employees as he may

deem necessary for the administration of the customs laws in the

Virgin Islands of the United States." 48 U.S.C. § 1406i.

Pursuant to that direction, the Secretary of the Treasury

promulgated 19 C.F.R. § 7.2. That regulation, in relevant part,

provides:

> The Secretary of the Treasury administers the
> customs laws of the U.S. Virgin Islands through the
> U.S. Customs and Border Protection. The importation
> of goods into the U.S. Virgin Islands is governed by
> Virgin Islands law; however, in situations where
> there is no applicable Virgin Islands law or no U.S.
> law specifically made applicable to the Virgin
> Islands, U.S. laws and regulations shall be used as
> a guide and be complied with as nearly as possible.
> Tariff classification of, and rates of duty
> applicable to, goods imported into the U.S. Virgin
> Islands are established by the Virgin Islands
> legislature.

19 C.F.R. § 7.2(c); *see also Virgin Islands Port Auth. v. United*

*States*, 136 Fed. Cl. 7, 8–9 (2018) ("As a part of the Treasury

Department, CBP's authority to administer customs law in the

Virgin Islands derives from the 1936 Revised Organic Act which

designated the Secretary of Treasury as administrator of Virgin

Islands customs law."); *United States v. Wray*, No. CR. 2002-53,

2002 WL 31628435, at *3 (D.V.I. June 17, 2002) ("[T]he executive

branch maintains jurisdiction over the administration of customs

laws within the Virgin Islands by virtue of the language of

section 36 of the 1936 Organic Act.").

As authorized by Congress, the Government of the Virgin

Islands imposes duties on many items of foreign origin that may

be imported into the United States Virgin Islands. *See* 33 V.I.C.

§ 525 (authorizing collection of customs duty on "any article of

foreign origin imported into the Virgin Islands[,] which . . .

has been shipped from within the United States Customs Zone," in

addition to duties collected in the United States). An

obligation to pay customs duties arises when certain items cross

from the mainland United States into the United States Virgin

Islands. Arguably then, some type of border--or an approximation

of one--exists between the United States Virgin Islands and the

rest of the United States with respect to items of foreign--that

is, non-United States--origin leaving the mainland and entering

the Virgin Islands. Significantly, however, while the

enforcement of Virgin Islands customs laws is assisted by

federal officials, the customs laws with respect to imported

goods are not federal but territorial laws. See *Pollard*, 326

F.3d at 401; *Hyde,* 37 F.3d at 121. While routine warrantless

border searches would aid in enforcing the custom laws of the

Virgin Islands, the interest of the United States in the

enforcement of territorial law is certainly no greater than the

interest of the United States in enforcing its own Constitution.[7]

Further, in *Hyde*, the Third Circuit found significant that

Congress, through 19 U.S.C. § 1467, had "specifically authorized

customs inspections when travelers enter the United States from

the Virgin Islands and other United States possessions in the

same manner as if the traveler had come from a foreign country."

---

[7]     With respect to the individual's interest, it is unclear how long the
United States has been conducting routine warrantless searches of incoming
mail. U.S. customs regulations provide that "all mail arriving from outside
the U.S. Virgin Islands which is to be delivered within the U.S. Virgin
Islands, is subject to Customs examination." 19 C.F.R. § 145.2. This broad
asserted authority seems at odds with another regulation, which clarifies
that "[f]irst class mail originating in the Customs territory of the United
States and arriving in the U.S. Virgin Islands, which is to be delivered
within the U.S. Virgin Islands, shall not be opened unless: (1) A search
warrant authorizing that action has been obtained from an appropriate judge
or United States magistrate, or (2) The sender or the addressee has been
given written authorization for the opening." 19 C.F.R. § 145.3; *see also* 19
C.F.R. § Pt. 145, Policy ("Customs officers and employees shall not open
first class mail arriving in the U.S. Virgin Islands for delivery there, if
it originated in the Customs territory of the United States, unless a search
warrant or written authorization of the sender or addressee is obtained.").
     Further, to the extent these searches have been consistently conducted,
there is less cause to find "sufficient public knowledge of the distinctive
status of the Virgin Islands to alert" those sending mail to the Virgin
Islands that their packages may be searched without a warrant. *See id.*
Individuals departing the Virgin Islands for the United States pass through a
customs checkpoint. This is an obvious signal to travelers that leaving the
Virgin Islands and entering a state is somewhat different than traveling from
one state to another. Individuals entering the Virgin Islands from a state
pass through no such obstacles that would alert them of the fact that leaving
a state and entering the Virgin Islands is materially different than
traveling between the states.
     In sum, the Court finds that the government's interest in conducting
the type of search at issue here is less compelling than the government's
interest in conducting the searches at issue in *Hyde*. In addition, the
intrusion on privacy here is more significant than the intrusion presented in
*Hyde*. Balancing these interests, the Court holds that the warrantless
searches of the sealed mail packages in this matter were not reasonable.

*See Hyde*, 37 F.3d at 121. The Court is aware of no statutory

authority authorizing similar inspections of persons or items

entering the United States Virgin Islands from the United States

mainland.

Moreover, there is no Supreme Court authority that supports

the proposition that recognition, or imposition, of a tax,

impost, or duty on sealed items traveling from a State into a

United States territory creates a border between the United

States territory and the State, at which border there is no

Fourth Amendment protection that attaches to the individual

whose sealed package travels from the State to the United States

Territory.

To be sure, there is appellate authority recognizing the

exclusion of the Virgin Islands from the United States customs

zone. *See Hyde*, 37 F.3d at 122.  The Third Circuit has not

extended this recognition to items traveling from the mainland

to the United States Virgin Islands. Indeed, the government has

directed the Court to no such authority; and the Court is aware

of none.

Further, no authority has acknowledged that the primary

purpose of the customs zone exclusion was to create a vehicle

for revenue enhancement in the then newly acquired Virgin

Islands and its developing economy. Yet, that is precisely what

the relevant legislative history indicates. *See Anti-Smuggling
Act: Hearings on H.R. 5496 Before the Comm. on Ways and Means*,
74th Cong. 61 (1935) ("MR. HILL. Why are the Virgin Islands
excepted [from the tariff act's definition of the 'United
States']? MR. MURPHY. The duties in the Virgin Islands are
collected under the old Danish law. At the time the Virgin
Islands came over to us that law was in effect. The collection
of duties, of course, comes under this Government, but the old
law remained in effect, and the duties go to the islands
themselves."); H. Rep. No. 1505, at 6 (1917) (explaining that
provision in 1917 Organic Act leaving Danish customs laws in
effect was intended to raise "import duties to support the
government of the islands"). Indeed, in 1914, the import duty
was conceived as a tool to augment and support the then-Danish
"Colonial Treasury." Thereafter, when Congress continued
collection of the import duty, through the mechanism of a
customs zone exclusion, it was a device to support the local
Virgin Islands economy. It is  beyond peradventure that Congress
did not conceive of the customs zone exclusion as a device to
weaken "fundamental personal rights guaranteed in the
Constitution," *Boumediene*, 553 U.S. at 758 (internal quotation
marks omitted), such as those enshrined in the Fourth Amendment.
The Court is aware of no organic Congressional decision or

enactment about the Virgin Islands suggesting that the customs

zone exclusion was to be a vehicle for a diminished view of

Constitutional protections afforded sealed items sent from the

mainland to the Virgin Islands, and the government has cited

none.[8]

Finally, the rationale for a border, and the border search

exception, is to keep out of the United States, or protect

against, those things which are outside of its border. *See*

*United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)

("Since the founding of our Republic, Congress has granted the

Executive plenary authority to conduct routine searches and

seizures at the border, without probable cause or a warrant, in

order to regulate the collection of duties and to prevent the

introduction of contraband into this country."). Recognizing

that purpose, the Supreme Court has counseled:

> The border-search exception is grounded in the
> recognized right of the sovereign to control, subject
> to substantive limitations imposed by the

---

[8] Any argument that the Virgin Islands's status as a territory warrants a
different conclusion is similarly unavailing. Indeed, the Third Circuit, in
another context, has recognized the vigor of a Constitutional mandate
implicit in legislation affecting the territory. *See JDS Realty Corp. v.
Gov't of Virgin Islands*, 824 F.2d 256, 259 (3d Cir. 1987), *judgment vacated
on other grounds,* 484 U.S. 999 (1988) ("That the Virgin Islands is an
unincorporated territory is of no consequence in terms of the constitution's
grant of affirmative power to Congress to regulate interstate commerce. . . .
We conclude that the powers granted to Congress by the commerce clause are
implicit in the territorial clause.").

>     Constitution, who and what may enter the country. .
>     . .The critical fact is that the envelopes cross the
>     border and enter this country. . . . It is their
>     entry into this country *from without it* that makes a
>     resulting search "reasonable."

*Ramsey*, 431 U.S. at 620 (emphasis added).

It is axiomatic that those things that originate in, and

stay within, the territory of the United States remain free from

border searches.[9] A central point highlighted by the Supreme

Court in its border search jurisprudence is that items subject

to a border search enter the country "*from without it.*" *See id.*

(emphasis added); *see also Almeida-Sanchez v. United States*, 413

U.S. 266, 272 (1973) ("'Travellers may be so stopped in crossing

an international boundary because of national self protection

reasonably requiring one entering the country to identify

himself as entitled to come in, and his belongings as effects

which may be lawfully brought in.'" (quoting *Carroll v. United*

*States*, 267 U.S. 132, 154 (1925)). The sealed packages that

---

[9] Thus, in the context of border searches, the following syllogism should hold
true.
>     (a) Sealed packages originating in a State mailed to a United
>         States destination are packages that travel and remain
>         within the United States.
>     (b) Packages that travel and remain within the United States
>         enjoy the protection of the Fourth Amendment from
>         warrantless searches.
>     (c) Therefore, sealed packages originating in a State that are
>         mailed to a United States destination enjoy the protection
>         of the Fourth Amendment from warrantless searches.

The argument advanced by the government here challenges that logic.
Indeed, the government's position causes the syllogism to implode.

arrived in the United States Virgin Islands did not come from
"without" the country.

Accordingly, the Court will grant Baxter's motion to
suppress.

### III. CONCLUSION

The Fourth Amendment of the United States Constitution has
protected individuals from unreasonable warrantless searches
since its existence. That protection has been recognized by the
United States Supreme Court as extending to sealed mail among
and between United States residents within United States
territory. The circumstances giving rise to this case--
warrantless searches of sealed mail packages sent from the
United States mainland to the United States Virgin Islands--
raise several questions.

First, does the Fourth Amendment apply in the United States
Virgin Islands? For almost a century, this Court has addressed
challenges to alleged violations of the Fourth Amendment by law
enforcement.[10] Significantly, the recognition of the Fourth

---

[10] *See, e.g.*, *United States v. Wright*, 493 Fed. App'x 265, 271 (3d Cir. 2012)
("Having settled that the warrants were deficient, we turn to the issue of
whether their deficiencies, when coupled with the law enforcement conduct
here, require suppression of the evidence found during the search."); *United
States v. Varlack Ventures*, 149 F.3d 212, 216 (3d Cir. 1998) ("[W]e have no
need to decide whether Fredericks enjoyed a reasonable expectation of privacy
in the public areas of his vessel since, even if he did, the Coast Guard
officers fulfilled the requirements for conducting a warrantless search of
his vessel."); *United States v. Williams*, 612 F.2d 735, 739 (3d Cir. 1979)

Amendment's protection in the United States Virgin Islands has

been unchallenged.

Second, to the extent that the Fourth Amendment applies in

the United States Virgin Islands, does it exist in some hybrid

form such that its protections fade, to some degree, merely

because a sealed package originating in the United States

mainland arrives in the United States Virgin Islands? The

position taken by law enforcement here suggests that a

Congressional act or administrative procedure that excludes the

United States Virgin Islands from the United States Customs Zone

does so in a way that denatures the Fourth Amendment such that

its full protection, which exists for citizens that send sealed

packages from the mainland to Puerto Rico,[11] fails to protect

those citizens who send sealed packages from the mainland to the

United States Virgin Islands.

---

("Exigent circumstances therefore existed, and we see no reason to second-guess their tactical decision to deny the suspect the advantages that delay to procure a warrant would have presented."); *Gov't of V.I. v. Rijos*, 285 F. Supp. 126, 132 (D.V.I. 1968) ("Since the issuance of the search warrant in this case was based upon sufficient probable cause, the subsequent search will not be deemed invalid on this basis."); *People v. Fisher*, 2 V.I. 395, 399 (Police Ct. 1953) ("That no warrant shall issue but upon probable cause supported by oath or affirmation and particularly describing as the place to be searched and the persons or things to be seized.").

[11] Puerto Rico is within the United States Customs Zone. See 19 U.S.C. § 1401(h) ("The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam.").

The Court is not persuaded that the Constitution supports such a position. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 180 (1803) ("[A] law repugnant to the constitution is void; . . . courts, as well as other departments, are bound by that instrument." (emphasis omitted)). Indeed, the Fourth Amendment is pregnant with protection against warrantless searches of citizens and their effects, including sealed packages, houses, papers and effects.[12] Neither the existence nor vigor of those protections is compromised because the destination of a sealed package from the United States mainland happens to be the United States Virgin Islands.

To the extent that the government engages in warrantless searches because it is tactical to do so, as it has indicated in this case and a related case, *see Suppression Hr'g Tr.*, ECF No. 99 at 116:4-14 ("THE COURT: . . . Why not get a warrant to just search [packages] and avoid all of this? MS. VLASOVA: Your Honor, as law enforcement strategy and tactic . . . .");

---

[12] The Supreme Court has recognized as much, instructing: "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *Jacobsen*, 466 U.S. at 114. The packages here are no different.

*Suppression Hr'g Tr.*, Crim. No. 1:17-11, ECF No. 85 at 4:23-5:1

("Q: Was there a specific target that was causing you to perform

this search?  A: No, ma'am. Just doing everything at random."),

it elevates expediency over the Constitution in a way it

admittedly would never do in a state or Puerto Rico, and it does

so unlawfully. Where that happens it is worth recalling the

Supreme Court's admonition:

> The needs of law enforcement stand in constant
> tension with the Constitution's protections of the
> individual against certain exercises of official
> power. It is precisely the predictability of these
> pressures that counsels a resolute loyalty to
> constitutional safeguards.

*Almeida-Sanchez*, 413 U.S. at 273. Finally, the *sine qua non* for

a border search is that the item enter the country from without.

That threshold condition never occurred. In sum, where, as here,

law enforcement conducts warrantless searches of sealed packages

sent from the United States mainland to the United States Virgin

Islands, law enforcement runs afoul of the Constitution.[13]

---

[13] In light of clear Supreme Court authority, it would seem to behoove law
enforcement to obtain a search warrant before searching any sealed mail
letter, package, or "wrapped parcel" travelling in any direction between the
Virgin Islands and the mainland. Given that such "effects" are in the custody
and control of law enforcement, and there is no danger of loss or destruction
of the effect, it would seem constitutionally prudent, and a minor task, to
obtain a search warrant.

The premises considered, it is hereby

**ORDERED** that the Court's order at the June 4, 2018, suppression hearing denying in part the motion to suppress docketed at ECF Number 79 is **VACATED**; it is further

**ORDERED** that the motion to suppress docketed at ECF Number 79 is **GRANTED**; and it is further

**ORDERED** that the physical evidence recovered from the warrantless searches conducted on March 31, 2017, and April 3, 2017, is **SUPPRESSED**.


S\_____
            **Curtis V. Gómez**
            **District Judge**